**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

DISPLAY TECHNOLOGIES, LLC,

    Plaintiff,

        v.

SONY CORPORATION OF AMERICA,

    Defendant.

Case No. 1:22-cv-00488-LJL

JURY TRIAL DEMANDED

**DEFENDANT SONY'S MEMORANDUM OF LAW IN**
**SUPPORT OF ITS FED. R. CIV. P. 12(b)(6) MOTION TO DISMISS FOR**
**UNPATENTABLE SUBJECT MATTER UNDER 35 U.S.C. § 101**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................... 1

II.     BACKGROUND ..................................................................................................... 2

    A.      The Purported Invention of the '723 Patent ............................................... 2

    B.      The Claims of the '723 Patent ................................................................... 3

    C.      The Claimed Subject Matter is Implemented Using Conventional Computing
        Devices and Networking Technologies ...................................................... 5

    D.      Plaintiff's Complaint Alleges Infringement by Systems that Transfer an
        Image from a Sony Camera to a Smartphone Application ........................... 9

III.    LEGAL STANDARD ............................................................................................. 9

IV.     ARGUMENT ....................................................................................................... 11

    A.      *Alice* Step 1: The Asserted Patent Claims Are Directed to the Abstract Idea of
        Transferring a Digital Media File for Display ......................................... 11

    B.      *Alice* Step 2: The Broad, Conventional, and Functional Claim Elements Do
        Not Transform the Abstract Idea into a Patent-Eligible Invention ............ 17

V.      CONCLUSION .................................................................................................... 22

i

# TABLE OF AUTHORITIES

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
    890 F.3d 1354 (Fed. Cir. 2018)...................................................................................... 19

*Affinity Labs of Texas, LLC v. Amazon.com Inc.*,
    838 F.3d 1266 (Fed. Cir. 2016)................................................................................ passim

*Affinity Labs of Texas, LLC v. DIRECTV, LLC*,
    838 F.3d 1253 (Fed. Cir. 2016)............................................................................ 12, 17, 21

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
    573 U.S. 208 (2014)............................................................................................... passim

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
    841 F.3d 1288 (Fed. Cir. 2016)...................................................................................... 21

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*,
    569 U.S. 576 (2013)......................................................................................................... 9

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
    827 F.3d 1341 (Fed. Cir. 2016)...................................................................................... 21

*Bridge and Post, Inc. v. Verizon Commn's., Inc.*,
    778 Fed. Appx. 882 (Fed. Cir. 2019).............................................................................. 11

*BSG Tech LLC v. Buyseasons, Inc.*,
    899 F.3d 1281 (Fed. Cir. 2018)............................................................................ 17, 20, 21

*ChargePoint, Inc. v. SemaConnect, Inc.*,
    920 F.3d 759 (Fed. Cir. 2019)........................................................................................ 20

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
    776 F.3d 1343 (Fed. Cir. 2014))....................................................................................... 5

*Crandall Techs. LLC v. Vudu, Inc.*,
    No. 20-cv-04849-VC, 2021 WL 521215 (N.D. Cal. Feb. 12, 2021) ......................... 14, 19

*Diamond v. Chakrabarty*,
    447 U.S. 303 (1980)....................................................................................................... 10

*Diamond v. Diehr*,
    450 U.S. 175 (1981)....................................................................................................... 11

*Elec. Power Group, LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016)................................................................................ 13, 18

*Fitbit, Inc. v. AliphCom*,
    233 F. Supp. 3d 799 (N.D. Cal. 2017) ........................................................................... 19

*Free Stream Media Corp. v. Alphonso Inc.*,
    996 F.3d 1355 (Fed. Cir. 2021).................................................................... 13, 14, 15

*Gabara v. Facebook, Inc.*,
    484 F. Supp. 3d 118 (S.D.N.Y. 2020)................................................................... 11, 22

*Genetic Techs. Ltd. v. Merial L.L.C.*,
    818 F.3d 1369 (Fed. Cir. 2016).................................................................................... 10

*Gottschalk v. Benson*,
    409 U.S. 63 (1972)....................................................................................................... 9

*In re TLI Commc'ns LLC Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016)........................................................................... 12, 14, 15

*Internet Patents Corp. v. Active Network, Inc.*,
    790 F.3d 1343 (Fed. Cir. 2015)............................................................................ 10, 11

*Interval Licensing LLC v. AOL, Inc.*,
    896 F.3d 1335 (Fed. Cir. 2018)....................................................................... 11, 17, 21

*Mayo Collab. Servs. v. Prometheus Labs., Inc.*,
    566 U.S. 66 (2012)............................................................................................. 9, 10, 18, 19

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016).................................................................................... 11

*Pers. Beasties Grp. LLC v. Nike, Inc.*,
    341 F. Supp. 3d 382 (S.D.N.Y. 2018)........................................................................... 5

*Pers. Beasties Grp. LLC v. Nike, Inc.*,
    792 F. App'x 949 (Fed. Cir. 2020) ............................................................................... 5

*Quantum Stream Inc. v. Charter Commc'ns, Inc.*,
    309 F. Supp. 3d 171 (S.D.N.Y. 2018)......................................................................... 21

*RecogniCorp, LLC v. Nintendo Co.*,
    855 F.3d 1322 (Fed. Cir. 2017).................................................................................... 18

*SAP Am., Inc. v. InvestPic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018).................................................................................... 10

*Trading Techs. Int'l, Inc. v. IBG LLC*,
    921 F.3d 1378 (Fed. Cir. 2019).................................................................................... 11

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017)............................................................................. 11, 21

*Ubisoft Entm't, S.A. v. Yousician Oy*,
    No. 2019-2399, 2020 WL 3096369 (Fed. Cir. June 11, 2020) ........................................ 20

*Uniloc USA, Inc. v. ADP, LLC*,
    772 F. App'x 890 (Fed. Cir. 2019) ............................................................................... 18

*W. View Research, LLC v. Audi AG,*
    685 F. App'x 923 (Fed. Cir. 2017) ................................................................................ 21

**Statutes**

35 U.S.C. § 101 ............................................................................................................ passim

**Rules**

Fed. R. Civ. P. 12 ....................................................................................................... 2, 10, 11

## I.    INTRODUCTION

Patent claims directed to a "desired function or outcome" without regard to how to implement that function or outcome are routinely held to be directed to an unpatentable "abstract idea." *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1268-69 (Fed. Cir. 2016) ("Affinity I").   This is the case here.

In its Complaint, Plaintiff Display Technologies, LLC ("Display") alleges that Defendant Sony Corporation of America ("Sony") infringes "at least Claim 1" of U.S. Patent No. 9,300,723 (the "'723 Patent").   *See* Dkt. No. 1 ("Complaint"), Introduction, ¶ 13.   Claim 1 describes little more than a generic "media system" in which a generic "media terminal" connects to a generic wireless "media node" via a generic "interactive computer network" to transfer a generic "media file" for display.   *See* Complaint, Ex. A ('723 Patent), 1:16-21, 1:53-2:2, 7:42-8:3 ("The present disclosure is generally related to a digital communication protocol structured to facilitate transferring and/or transmitting one or more digital media files to and/or from a media terminal and a media node via at least one interactive computer network").[1]

The '723 Patent instructs that the claims are aspirational in nature and not bound by **any** specific technology. *See, e.g., id.*, 2:40-48 (the claimed "media terminal" can be "any device structured to facilitate the practice of the present system"); *id.*, 2:49-57 (the claimed "media node" can be "any . . . digital media device structured to facilitate the practice of the present system"); *id.*, 2:60-3:15 (the claimed "interactive computer network . . . may include a Local Area Network ('LAN'), Wide Area Network ('WAN'), Private Area Network ('PAN'), peer-to-peer network, near field communication ('NFC'), Bluetooth network, etc."); *id.*, 3:47-50 (the claimed "digital media file" can be "any electronic file or data such as a digital photograph,

---

[1] Citations to the '723 Patent are in the form "x:y-z" where "x" is the cited column number and "y-z" are the cited lines.

video, audio, animation, text, or any other electronic document or object"). The foregoing generic components existed well before the '723 Patent. Indeed, the '723 Patent identifies these well-known components by name in the specification.

Critically, the claims do not require—and the specification does not even describe—any specific software, circuitry, control logic, parameters, or other technical means for implementing the features of the claims. Instead, the patent merely states it would be "advantageous" or "beneficial" for the claimed media system to obtain the desired result of transferring a digital media file for display, without ever describing "how" to do so. *See, e.g., id.*, 1:52-2:2 ("it would be advantageous if the digital media communication protocol of the present specification is structured to facilitate transferring or transmitting one or more digital media files between two or more media devices"; "it would be particularly beneficial if the various media devices . . . are structured to display . . . the one or more digital media files").

Because the claims of the '723 Patent describe nothing more than a desired function or result—transferring a digital media file for display—without any detail on how to achieve that function or result, they are directed solely to an abstract idea not eligible for patenting under 35 U.S.C. § 101.

## II.    BACKGROUND

### A.    The Purported Invention of the '723 Patent

The '723 Patent, entitled "Enabling Social Interactive Wireless Communications," issued March 29, 2016 from U.S. Patent App. No. 13/494,097 filed June 12, 2012. The Background section of the '723 Patent states that then-existing portable devices (such as a smartphone, MP3 player, or PDA) were capable of storing digital media files (such as photo, video, or music files) in memory on the device. '723 Patent, 1:22-36. However, according to the '723 Patent, "many

of th[ose] devices include relatively small display screens" and/or "speakers" that are "small and produce minimal or poor sound." *Id.*, 1:37-43.  For this reason, users "may desire to share the digital media files and/or transfer, display, or play the files on a computer or other media device equipped with a larger or better quality screen, or having higher quality speakers than that disposed on the portable device(s)." *Id.*, 1:44-49.

Accordingly, the '723 Patent states that it would be "advantageous" or "beneficial" if a media system were "structured to facilitate transferring or transmitting one or more digital media files between two or more media devices" in order "to display, save, edit, manipulate, and/or transfer the one or more digital media files" on the receiving device. *Id.*, 1:52-2:2. The patent does not, however, describe specifically **how** the components of the media system are "structured to facilitate" the desired result of transferring a digital media file for display. *See, e.g., id.*

### B.    The Claims of the '723 Patent

Asserted claim 1 describes a "media system" in which a "media terminal" connects to a wireless "media node" via an "interactive computer network," which is "structured to bypass at least one media terminal security measure for a limited permissible use of . . . transferring . . . and displaying" a "digital media file" on the "media terminal":

> 1. A media system, comprising:
>
> at least one media terminal disposed in an accessible relation to at least one interactive computer network,
>
> a wireless range structured to permit authorized access to said least one interactive computer network,
>
> at least one media node disposable within said wireless range, wherein said at least one media node is detectable by said at least one media terminal,

3

at least one digital media file initially disposed on at least one of said at least one media terminal or said at least one media node, said at least one media terminal being structured to detect said at least one media node disposed within said wireless range,

a communication link structured to dispose said at least one media terminal and said at least one media node in a communicative relation with one another via said at least one interactive computer network,

said communication link being initiated by said at least one media terminal,

said at least one media node and said at least one media terminal being structured to transmit said at least one digital media file therebetween via said communication link, and

said communication link is structured to bypass at least one media terminal security measure for a limited permissible use of the communication link by the media node to only transferring the at least one digital media file to, and displaying the at least one digital media file on, the at least one media terminal.

'723 Patent, 7:42-8:3.

There are four additional independent claims. Each describes essentially the same elements and functionalities, but packages them as a "media system" (claim 12), a "method of transferring a media file" (claim 22), a "wireless mobile device configured to transmit a media file" (claim 32), or a "transfer system from [sic] transferring a media file" (claim 42). *Id.*, 8:29-59, 9:18-47, 10:4-34, 10:58-11:22. The dependent claims (claims 2-11, 13-21, 23-31, 33-41, and

43-50) add commonplace features associated with existing media terminals/systems, communication links, digital media files, and/or security measures.[2]

Accordingly, for the purpose of this motion, claim 1 is representative of the other claims, which are "substantially similar and linked to the same abstract idea." *Pers. Beasties Grp. LLC v. Nike, Inc*., 341 F. Supp. 3d 382, 386 (S.D.N.Y. 2018) (quoting *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014)), *aff'd*, 792 Fed. App'x 949 (Fed. Cir. 2020).

## C.   The Claimed Subject Matter is Implemented Using Conventional Computing Devices and Networking Technologies

The claims and the specification are not limited to any specific technology for transmitting video or audio data (the "digital media file") from one device (the "media node") to another device (the "media terminal") over a Bluetooth or WiFi data channel (the "communication link") of a Bluetooth or WiFi network (the "interactive communication network") that is "structured to bypass" at least one password or key (the "media terminal security measure").   *See, e.g.*, '723 Patent, 7:42-8:3.   For example, Figure 4 of the patent, reproduced below, illustrates the features of the media system of claim 1:

---

[2] These commonplace features include: a "firewall" that is bypassed "completely" (claims 2-3, 13-14, 23-24, 33-34, 43-44); a media terminal/system that is a "navigation" or "audio" system (claims 4-5, 15-16, 25-26, 35-36, 45-46); a communication link that is a "peer-to-peer," "Bluetooth," or "WiFi" connection (claims 6, 17, 27, 37, 47); and a digital media file that is an "image," "video," "gaming," or "streaming video" file (claims 7, 18, 28, 38, 48), which is "present[ed] . . . on a display," "provided by the . . . media node"/"mobile device," or "received from a server upon instructions provided by the . . . media node"/"mobile device" (claims 8-11, 19-21, 29-31, 39-41, 49-50). *See id.*, 8:4-28, 8:60-9:17, 9:48-10:3, 10:35-10:57, 12:1-21.



FIGURE 4

*Id.*, 2:20-22, 2:31-33, 6:52-54, Fig. 4.

The components of the claimed systems and methods are all generic computing devices and networking technologies. Specifically, the '723 Patent explains that the "media node 30" at step 102 (*id.*, 7:12-13) may be "any . . . digital media device structured to facilitate the practice of the present system," including "a portable device such as a cellular or mobile telephone, PDA, portable mp3 player, laptop or notebook computer," or "a more stationary device or structure such as, for example, a desktop computer," all of which were conventional and ubiquitous. *Id.*, 2:49-57.

The "media terminal 20" at step 104 (*id.*, 7:16-18) may be "any device structured to facilitate the practice of the present system . . . including but in no way limited to a desktop

6

computer, laptop or notebook computer, PDA, video game console, mobile telephone, media system of a vehicle (e.g., an automobile), etc.," that is "structured to detect and/or identify the media node 30" using parameters such as "a device name, model/serial number, Media Access Control ('MAC') address, or Internet Protocol ('IP') address," all of which were also conventional and ubiquities. *Id.*, 2:36-48, 4:3-16.

The "communication link 70" via an "interactive computer network 40" established by the conventional "media terminal 20" at steps 106 and 108 (*id.*, 7:18-25) may be "one or more home, office, private, limited, or closed interactive computer networks 40 at least partially defined by one or more networking devices 42," including any "Local Area Network ('LAN'), Wide Area Network ('WAN'), Private Area Network ('PAN'), peer-to-peer network, near field communication ('NFC'), Bluetooth network, etc." communicating via conventional and ubiquitous networking protocols. *Id.*, 2:58-3:15.

Finally, the "digital media file 60" transmitted from the conventional "media node 30" to the conventional "media terminal 20" via the conventional "communication link 70" at step 110 (*id.*, 7:25-34) "may include virtually any electronic file or data such as a digital photograph, video, audio, animation, text, or any other electronic document or object," all of which were likewise conventional and ubiquitous. *Id.*, 3:47-50.

The only remaining feature of representative claim 1 is the final element of the claim— which describes the abstract idea of a "communication link" that is "structured" in some undisclosed way "to bypass at least one media terminal security measure for a limited permissible use of . . . transferring . . . and displaying" the conventional "digital media file" on the conventional "media terminal." *Id.*, 7:65-8:3. The patent's lack of specificity on **how** to

achieve this result only confirms that this element too is abstract and not based on any technological invention or advance.

For example, the "at least one media terminal security measure" that is bypassed can include "any . . . networking device security measure(s)" ensuring that "only authorized individuals or computers . . . have access," "including a firewall, and/or passwords/keys such as, for example, Wi-Fi Protected Access ('WPA') keys, and/or Wireless Application Protocol ('WAP') keys." *Id.*, 3:27-38. The patent provides no explanation or technical details of how these ubiquitous and conventional security measures are bypassed. Instead, the specification merely confirms the aspirational nature of the claims, namely, that "it would be beneficial" to accomplish the claimed result of bypassing a security measure:

> In particular, it would be beneficial if the digital media communication protocol includes a communication link structured to bypass at least one or more security measures, such as a password and/or firewall . . . . [T]he initiation of the communication link 70 by the media terminal 20, such as through a request to establish a communication link 70, at least partially allows the communication link 70 to bypass the firewall or other media terminal security measure(s) 21.

*Id.*, 1:58-64, 5:17-44.

The '723 Patent also states that:

> [I]t would be particularly beneficial if the various media devices, including the media terminal(s) and/or media node(s), are structured to display, save, edit, manipulate, and/or transfer the one or more digital media files. . . . For illustrative purposes only, the communication link 70, the terminal program, and/or the node program may be structured to include a selective set of parameters which define or limit the permissions associated with the communication link 70.

*Id.*, 1:65-2:2, 6:21-38. These cited portions of the patent constitute essentially the entire disclosure relating to bypassing, in whole or in part, a security measure of any kind.

8

### D.      Plaintiff's Complaint Alleges Infringement by Systems that Transfer an Image from a Sony Camera to a Smartphone Application

In its Complaint, Display alleges that representative claim 1 of the '723 Patent is infringed by Sony "media systems" that allow a user to wirelessly transfer images captured by a Sony camera to the "Sony Imaging Edge mobile application" running on a smartphone.  *See, e.g.*, Complaint ¶¶ 13-14.  In addition to filing this lawsuit against Sony, Display has filed more than 60 other lawsuits in various district courts alleging infringement of the '723 Patent.  *See, e.g.*, Ex. 1 (Display Litigations).  None of those cases progressed beyond the initial stages of fact discovery.  No court has ever construed the '723 Patent claims or decided whether the '723 Patent is invalid or not infringed.  Instead, as one court recently recognized, "Plaintiff's business model does not involve actual litigation," and instead "[t]he goal is simply a 'nuisance-value' settlement" costing the defendant less than it would cost to prove the patent is invalid or not infringed.  Ex. 2 (August 5, 2021 Order in Case No. 1:20-cv-00258-RGA (D. Del.)) at 2.

## III.    LEGAL STANDARD

35 U.S.C. § 101 provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." The Supreme Court has "long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable."  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)).  These exceptions concern subject matter that is "free to all men and reserved exclusively to none," because they "are the basic tools of scientific and technological work."  *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012) (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972), and *Diamond v. Chakrabarty*, 447

U.S. 303, 309 (1980)).  Patent claims that are directed to one of these categories of ineligible subject matter are not patentable even if they meet all the other requirements of the statute and are otherwise "new" and "inventive."  *See SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018).

To distinguish "patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts," the Supreme Court has articulated a two-part test.  *Alice*, 573 U.S. at 217.  Under step one of the *Alice* framework, "the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter."  *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346, 1348 (Fed. Cir. 2015).  If so, courts proceed to the second step and "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application."  *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 78-79).  This requires "a search for an 'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'"  *Id.* at 217-18 (quoting *Mayo*, 566 U.S. at 72).

"Like other legal questions based on underlying facts, this question [of whether patent claims are directed to subject matter eligible for patenting] may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion . . . ."  *SAP*, 898 F.3d at 1166; *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373-74 (Fed. Cir. 2016) ("We have repeatedly recognized that in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion."); *Gabara v. Facebook, Inc.*, 484 F. Supp. 3d 118, 125-26 (S.D.N.Y.

2020) (granting Rule 12(b)(6) motion and dismissing patent infringement claims under 35 U.S.C. § 101).

## IV.    ARGUMENT

Under the two-part *Alice* test, the claims of the '723 Patent are directed to an abstract idea—transferring a digital media file for display—which is subject matter not eligible for patenting as a matter of law.

### A.    *Alice* Step 1: The Asserted Patent Claims Are Directed to the Abstract Idea of Transferring a Digital Media File for Display

At *Alice* step one "the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents Corp.*, 790 F.3d at 1346. To determine what purported invention the claims are "directed to," courts look to the "focus of the claimed advance." *See, e.g.*, *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1378, 1384 (Fed. Cir. 2019); *Bridge and Post, Inc. v. Verizon Commn's., Inc.*, 778 Fed. Appx. 882, 887 (Fed. Cir. 2019). Where, as here, the claimed advance is a desired "result or effect," as opposed to a "specific means" of achieving the result, the claims are directed to an unpatentable abstract idea. *See, e.g., Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017); *Interval Licensing LLC v. AOL, Inc*., 896 F.3d 1335, 1344-46 (Fed. Cir. 2018) (claims that include "broad, result-oriented" language, "without any limitation on how to produce that result," are directed to a "patent-ineligible concept"). Patents are properly issued for the implementation of ideas, but not the ideas themselves. *See McRO, Inc. v. Bandai Namco Games Am. Inc*., 837 F.3d 1299, 1314 (Fed. Cir. 2016) ("A patent may issue 'for the means or method of producing a certain result, or effect, and not for the result or effect produced.'" (quoting *Diamond v. Diehr*, 450 U.S. 175, 182 n.7 (1981))).

In determining whether specific patent claims are directed to an abstract idea, courts look to see how other courts have treated similar claims. *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1260 (Fed. Cir. 2016) ("Affinity II") (comparing asserted claims to claims in "several of this court's recent cases"). Here, the Federal Circuit has consistently held that patents broadly claiming in functional terms the transmission of digital media from one device to another over a computer network for a desired purpose are directed to an abstract idea.

For example, in *In re TLI Communications LLC Patent Litigation*, the asserted patent described methods and systems for "storing . . . digital images" in a "telephone unit," "transmitting . . . the digital images and classification information to a server," and "storing the digital images in the server" based on the "classification information." 823 F.3d 607, 610 (Fed. Cir. 2016). Similar to the present case, the court noted that "[t]he specification does not describe a new telephone, a new server, or a new physical combination of the two," and instead acknowledges "existing telephone systems could transmit pictures, audio, and motion pictures'" to a "server . . . performing generic computer functions such as storing, receiving, and extracting data." *Id.* at 612. As such, "the focus of the patentee and of the claims was not on an improved telephone unit or an improved server" that provided "a solution to a 'technological problem,'" but instead on "the abstract idea of classifying and storing digital images in an organized manner." *Id.* at 613. The same is true here, namely, the '723 Patent leverages ubiquitous computing devices and networking technologies comprising a communication system. It does **not** create a new communication system, does **not** create a new component of a communication system, and does **not** create a new way to transfer data in a communication system. *See supra* Sections II.B-II.C.

Similarly, in *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, the asserted patent described a "a network-based media system . . . in which the system delivers streaming content from a network-based resource upon demand to a handheld wireless electronic device having a graphical user interface." *Affinity I*, 838 F.3d at 1267-68.  The court explained it was "not debatable" that "the idea of delivering media content to a wireless portable device" was "well known long before the [March 2000] priority date" of the asserted patent. *Id.* at 1269-70.[3]  The patentee then argued that the claim terms directed to a "customized user interface" on the portable device provided a specific technical invention that was not abstract. *Id.* at 1271.  The Court disagreed.  Characterizing the claims as being drafted in "largely functional terms" and "'without limiting them to technical means for performing the functions," the court held the claims were directed to "the abstract idea of delivering media content to a handheld electronic device." *Id.* at 1269-71 (quoting *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1351 (Fed. Cir. 2016)). The same is true here.  The claims of the '723 Patent use generic computing devices such as a "media terminal" or "node" to establish a generic "communication link" over a generic "interactive computer network" to transfer a generic "digital media file" for display. *See supra* Sections II.B-II.C.

Finally, and of particular relevance here, in *Free Stream Media Corp. v. Alphonso Inc.*, the asserted patent claims were directed to a "system providing a mobile phone user with targeted information (i.e., advertisements) that is deemed relevant to the user based on data gathered from the user's television."  996 F.3d 1355, 1358-59 (Fed. Cir. 2021).  The patentee argued that the claims were directed to a "specific asserted improvement in computer capabilities" because the claims required the "bypassing" of certain security "barriers" in order

---

[3] The earliest possible priority date of the '723 Patent is December 7, 2007, more than **seven years** after the priority date of the patent in *Affinity I*. *See* '723 Patent, Cover Page.

to access an otherwise secure "sandboxed application" on the mobile device.  *Id.* at 1362.  The Federal Circuit found the claims to be abstract because they describe only "that the mechanism used to achieve this communication is by piercing or otherwise overcoming a mobile device's security sandbox," but "do not at all describe how that result is achieved."  *Id.* at 1363-64.[4] Here, the '723 Patent discloses and claims a communication link that is "structured to bypass" a security measure, without ever mentioning how to achieve this desired result.  *See supra* Sections II.B-II.C.

The claims of the '723 Patent are very similar to the claims at issue in *TLI*, *Affinity I*, and *Free Stream Media*, and are unpatentable for the same reasons:  they use broad, functional, result-oriented terms to preempt essentially every way of using conventional devices and computer networks to transfer a digital media file for display on a media terminal.  *See supra* Sections II.A-II.C.  These broad, functional elements are devoid of any technology, much less technical details or constraints on **how** to achieve the claimed results. For example, there are no restrictions on how: (1) the "media terminal" detects a "media node," (2) the "media terminal" initiates a "communication link" with the "media node" via the "interactive communication network" to transmit and display a "digital media file," and (3) the "communication link" is "structured to bypass at least one media terminal security measure." *See supra* Section II.B (citing '723 Patent, 7:42-8:3).

---

[4] Many district courts also have reached the same result with respect to similar patent claims. *See, e.g., Crandall Techs. LLC v. Vudu, Inc.*, No. 20-cv-04849-VC, 2021 WL 521215, at *1 (N.D. Cal. Feb. 12, 2021) (patent claims describing "an arrangement of generic devices connected through a generic wireless data-sharing network along with software allowing a user to pick content on one device and display it on the second device" were directed to an unpatentable abstract idea).

Indeed, like the claims at issue in *TLI*, *Affinity I*, and *Free Stream Media*, the claims of the '723 Patent do no more than identify exemplary, ubiquitous, conventional, and generic computing devices and networking technologies:

> **For the Media Node:** "any . . . digital media device structured to facilitate the practice of the present system," including "a portable device such as a cellular or mobile telephone, PDA, portable mp3 player, laptop or notebook computer," or "a more stationary device or structure, such as, for example, a desktop computer" ('723 Patent, 2:49-57);

> **For the Media Terminal:** "any device structured to facilitate the practice of the present system . . . including but in no way limited to a desktop computer, laptop or notebook computer, PDA, video game console, mobile telephone, media system of a vehicle (e.g., an automobile), etc." (*id.*, 2:36-48)

> **For the Communication Link via an Interactive Computer Network:** "one or more home, office, private, limited, or closed interactive computer networks 40 at least partially defined by one or more networking devices 42," including any "Local Area Network ('LAN'), Wide Area Network ('WAN'), Private Area Network ('PAN'), peer-to-peer network, near field communication ('NFC'), Bluetooth network, etc." (*id.*, 2:58-3:15);

> **For the Digital Media File:** "virtually any electronic file or data such as a digital photograph, video, audio, animation, text or any other electronic document or object" (*id.*, 3:47-50); and

> **For the Media Terminal Security Measure:** "any . . . networking device security measure(s)" ensuring that "only authorized individuals or computers . . . have

15

access," "including a firewall, and/or passwords/keys such as, for example, Wi-Fi Protected Access ('WPA') keys, and/or Wireless Application Protocol ('WAP') keys" (*id.*, 3:27-38).

But then the '723 Patent purports to go further and encompass not just the exemplary computing devices and networking technologies described in the specification, but "**any device** structured to facilitate the practice of the present system." *See supra* Section II.C (citing '723 Patent, 2:49-57 (media node); *id.*, 2:36-48, 4:3-16 (media terminal); *id.*, 2:58-3:15 (communication link/interactive communication network); *id.*, 3:47-50 (digital media file); *id.*, 3:27-38 (media terminal security measure)) (emphasis added).  Further, neither the claims nor the specification describes **any specific way** that these elements may be "structured" to achieve the claimed functions.  *See id.*  Instead, the claims simply describe the abstract idea and tell the user to "apply" it in any way possible.

By way of analogy, the unbounded claims of the '723 Patent are so broad that they cover an abstract idea as old as the United States Postal Service: a mail carrier (media node) delivers mail (media file) to an address of the recipient (media terminal), and slips it through a letter slot in an otherwise locked door (media terminal security measure) for only the recipient to read. Other than describing that these things take place in a digital environment with (conventional) computing devices and networking technologies, the claims do not meaningfully restrict this otherwise ubiquitous abstract idea.

The dependent claims likewise include only broad and generic descriptions of the elements of the independent claims: the security measure is a "firewall" that is bypassed "completely" (claims 2-3, 13-14, 23-24, 33-34, 43-44); the media terminal is a "navigation" or "audio" system (claims 4-5, 15-16, 25-26, 35-36, 45-46); the communication link is a "peer-to-

peer," "Bluetooth," or "WiFi" connection (claims 6, 17, 27, 37, 47); and the digital media file is an "image," "video," "gaming," or "streaming video" file (claims 7, 18, 28, 38, 48), which is "present[ed] . . . on a display," "provided by the . . . media node," or "received from a server" (claims 8-11, 19-21, 29-31, 39-41, 49-50).  *See supra* Section II.B & n.2 (citing '723 Patent, 8:4-28, 8:60-9:17, 9:48-10:3, 10:35-10:57, 12:1-21).  Like the independent claims, the dependent claims do not describe any specific software, circuitry, control logic, parameters, or other technical means for implementing the result-oriented limitations of the claims.  Instead, they merely describe incrementally narrower applications of the same abstract idea.  *See, e.g., BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1287 n.1 (Fed. Cir. 2018) ("[A] claim is not patent eligible merely because it applies an abstract idea in a narrow way. . . .  For this reason, whether dependent claims 2-4 of the '699 patent are directed to an abstract idea at step one depends upon whether independent claim 1 is directed to an abstract idea."); *Affinity II*, 838 F.3d at 1259 ("limiting the field of use of the abstract idea to a particular existing technological environment does not render the claims any less abstract").

Accordingly, the claims of the asserted '723 Patent are directed to an abstract idea: using conventional and ubiquitous computing devices and networking technologies to transfer a digital media file for display.  This is the epitome of an unpatentable abstract idea at step one.  *See Interval Licensing*, 896 F.3d at 1343 (finding claims abstract because they "were drafted in such a result-oriented way that they amounted to encompassing the 'principle in the abstract' no matter how implemented").

**B.      *Alice* Step 2: The Broad, Conventional, and Functional Claim Elements Do Not Transform the Abstract Idea into a Patent-Eligible Invention**

At *Alice* Step Two, the Court must "consider the elements of each claim both individually and 'as an ordered combination'" to determine whether they provide "an 'inventive concept'"

that is "'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself.'" *Alice*, 573 U.S. at 217-18 (quoting *Mayo*, 566 U.S. at 72-73 79).  Any such inventive concept must be described in the claims, not imported from the specification.  *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017).  Merely "limiting the claims to [a] particular technological environment . . .  is, without more, insufficient to transform them into patent-eligible applications of the abstract idea at their core." *Elec. Power Grp.*, 830 F.3d at 1354.

As described above, the claims of the '723 Patent describe methods and systems in which a "media terminal" connects to a wireless "media node" via an "interactive computer network," which is "structured to bypass at least one media terminal security measure for a limited permissible use of . . . transferring . . . and displaying" a "digital media file" on the "media terminal."  *See supra* Section II.B (quoting, e.g., claim 1).  The specification acknowledges that the claimed "media terminal" can be "any device" ('723 Patent, 2:36-48); that the claimed "media node" can be "any . . . digital media device" (*id.*, 2:49-57); that the claimed "interactive computer network" can be any "Local Area Network ('LAN'), Wide Area Network ('WAN'), Private Area Network ('PAN'), peer-to-peer network, near field communication ('NFC'), Bluetooth network, etc." (*id.*, 2:58-3:15); that the claimed "digital media file" can be "any electronic file or data" (*id.*, 3:47-50); and that the claimed "media terminal security measure" can be "any . . . networking device security measure(s)" (*id.*, 3:27-38).  *See generally supra* Sections II.B-II.C.  As such, each of these claimed devices and technologies was well-known, conventional, and not inventive as a matter of law at step two.[5]

––––––––––––––––––

[5] The specification's description of the claim elements as generic and conventional confirms there are no disputed issues of fact underlying the step two analysis.  *See, e.g., Uniloc USA, Inc. v. ADP, LLC*, 772 F. App'x 890, 900 (Fed. Cir. 2019) ("Uniloc argues that whether the

In addition, the claimed functionality of the "media terminal" detecting and initiating a "communication link" with the "media node" via an "interactive communication network" to transmit a "digital media file" (*see, e.g.,* '723 Patent, 7:42-8:3) was likewise well-known, conventional, and not inventive.  That functionality could be implemented using the conventional devices (a "computer," "PDA," "video game console," "mobile telephone," etc.) and networking technologies (the "World Wide Web," "Internet," "WiFi," "Bluetooth," "near field communication ('NFC')," etc.) cited in the specification.  *See* '723 Patent, 2:36-3:15, 3:47-5, 8:15; *see also Affinity I,* 838 F.3d at 1269-70 (finding it "not debatable" that "the idea of delivering media content to a wireless portable device" was "well known long before" March 2000); *Crandall Techs.* 2021 WL 521215, at *1 (describing "generic devices connected through a generic wireless data-sharing network along with software allowing a user to pick content on one device and display it on the second device"); *Fitbit, Inc. v. AliphCom*, 233 F. Supp. 3d 799, 810 (N.D. Cal. 2017) ("The parties do not seem to dispute that device pairing, in its most basic form, constitutes an abstract idea. Nor could they. Establishing a dedicated line of communication between two points . . . has been employed in everything from secure military communications to garage door openers.").

The remaining element of the claims merely states that the claimed "communication link" is "structured to bypass at least one media terminal security measure for a limited permissible use of . . . transferring . . . and displaying" the "digital media file."  *E.g.*, '723 Patent, 7:65-8:3.

---

components were conventional under step [two] is a question of fact, and that the district court erred by deciding these fact issues against Uniloc as the non-moving party. . . .  We disagree. The district court adequately supported its conclusion by reference to the specification's description of a prior art client-server environment."); *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 890 F.3d 1354, 1356 (Fed. Cir. 2018) (Moore, J., concurring) ("In a situation where the specification admits the additional claim elements are well-understood, routine, and conventional, it will be difficult, if not impossible, for a patentee to show a genuine dispute [of fact under step two]." (discussing *Mayo*, 566 U.S. at 73-74, 79-80)).

This functionality, however, is not discussed in any further detail in the specification.  That is, there is no guidance on how to "structure" a communication link to accomplish the claimed result of bypassing a security measure to transfer and display the digital media file.  *See supra* Section II.C (citing '723 Patent, 1:58-2:2, 5:17-44, 6:21-38).  Because the patent simply instructs the reader to "apply" this abstract idea without disclosing unique and purportedly inventive hardware or software to do so, the reader is left to his or her own devices to figure out how to implement a technological solution that achieves this desired result.

Accordingly, the functional and result-based claim language "simply restates . . . [the] abstract idea" itself, and is "irrelevant" to whether there is an inventive concept at step two.  *See BSG Tech*, 899 F.3d at 1291; *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 775 (Fed. Cir. 2019) ("From the claims and the specification, it is clear that network communication is the only possible inventive concept.  Because this is the abstract idea itself, this cannot supply the inventive concept at step two."); *Ubisoft Entm't, S.A. v. Yousician Oy*, 814 Fed. Appx. 588, 592 (Fed. Cir. 2020) ("If a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques—e.g., a generic computer—the claim has not been transformed into a patent-eligible application of an abstract idea.").

The additional elements set out in the dependent claims also do not provide an inventive concept.  Those elements merely use the abstract idea with additional ubiquitous items such as a firewall; a navigation or audio system; a peer-to-peer, Bluetooth, or WiFi communication network; or an image, video, or gaming digital media file that is received and displayed.  *See supra* Section II.B & n.2 (citing '723 Patent, 8:4-28, 8:60-9:17, 9:48-10:3, 10:35-10:57, 12:1-21).  Nothing in the dependent claims changes their abstract nature—those claims merely include additional elements that apply the abstract idea to systems that are themselves conventional and

non-inventive.  As such, the additional elements do not make the idea itself any less abstract or any more inventive.  *See BSG Tech*, 899 F.3d at 1291 ("As a matter of law, narrowing or reformulating an abstract idea does not add 'significantly more' to it."); *Affinity II*, 838 F.3d at 1264 ("the dependent claims . . . all recite functions that are not inventive but simply constitute particular choices from within the range of existing content or hardware"); *Interval Licensing*, 896 F.3d at 1347 (claim limitations "recited at a high level of generality and conventional" do not "'solve a technology-based problem'" or provide an inventive concept (quoting *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300 (Fed. Cir. 2016))); *W. View Research, LLC v. Audi AG*, 685 F. App'x 923, 926-27 (Fed. Cir. 2017) (finding no inventive concept when the "specification recites 'many different arrangements for the disposition of various components within the system,'" and "the components involved . . . are generic").

Finally, there also is no inventive concept in the ordered combination of conventional elements comprising the claimed system.  The particular order of the claimed steps is merely common sense: first detect a wireless device, then initiate a communication link via a computer network, and then bypass a security measure in order to transfer and display a digital media file on the receiving device.  *See generally supra* Section II.B (citing, e.g., '723 Patent, 7:42-8:3).  There is no inventive concept in using common sense to apply an abstract idea in a generic and conventional way.  *See, e.g., Two-Way Media*, 874 F.3d at 1341 ("The steps are organized in a completely conventional way—data are first processed, sent, and once sent, information about the transmission is recorded.  The claims thus fail to describe a 'specific, discrete implementation of the abstract idea' sufficient to qualify for eligibility under § 101." (quoting *BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016))); *Quantum Stream Inc. v. Charter Commc'ns, Inc.*, 309 F. Supp. 3d 171, 187 (S.D.N.Y. 2018) ("the

straightforward implementation of the benefits of an abstract idea does not itself give rise to an inventive concept"); *Gabara*, 484 F. Supp. 3d at 127 ("Simply put, the "[Asserted] Patents are insufficiently inventive. They purport to employ conventional computer hardware and processes, in an ordinary manner, to achieve the idea at the heart of the invention.").

## V.      CONCLUSION

For the foregoing reasons, Sony respectfully requests that the Court hold oral argument on this motion, find the '723 Patent is directed to subject matter not eligible for patenting under 35 U.S.C. § 101, and dismiss the Complaint with prejudice.

Date:  April 11, 2022                                      Respectfully submitted,

 */s/ Lewis V. Popovski*

Lewis V. Popovski
Ryan J. Sheehan
George S. Soussou
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
 (212) 336-2000
lpopovski@pbwt.com
rsheehan@pbwt.com
gsoussou@pbwt.com

***Attorneys for Defendant Sony Corporation of America***

22

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on April 11, 2022.

*/s/ Lewis V. Popovski*